**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **JAMES LASKA,** | |
| Plaintiff, | |
| v. | Civil Action No. 7:17-CV-212 (HL) |
| **KELLEY MANUFACTURING CO. d/b/a KMC MANUFACTURING COMPANY,** | |
| Defendant. | |

## ORDER

Plaintiff James Laska, a former employee of Kelley Manufacturing Co. d/b/a KMC Manufacturing Company ("Kelley Manufacturing Co." or "KMC"), filed this lawsuit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), alleging that Defendant terminated his employment in retaliation for Plaintiff reporting what he believed to be discriminatory conduct. Now before the Court is Defendant's Motion for Summary Judgment. (Doc. 28). After reviewing the pleadings, briefs, depositions, and other evidentiary materials presented, the Court concludes that there is no genuine dispute of the material facts and finds that Defendant is entitled to judgment as a matter of law.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Kelley Manufacturing Co. is an employee-owned manufacturing company located in Tifton, Georgia. (Doc. 28-10, ¶¶ 2-3). The company is managed by an

Executive Committee, which is comprised of the Chief Executive Officer ("CEO"), Lanier Carson, the President, Bennie Branch, and the Chief Financial Officer ("CFO"), Jimmy Tomberlin. (Branch Dep., p. 9; Doc. 28-19, ¶¶ 8, 37). The Executive Committee reports to the Sole Shareholder and the Trustees,[1] which in turn report to a Board of Directors. (Branch Dep., p. 9; Doc. 28-19, ¶ 37).

Toward the end of 2016, KMC's long-time Vice President of Sales and Marketing announced his retirement. (Laska Dep., p. 107). As the company began its search for a replacement, Plaintiff's wife Debra Laska, who served as KMC's Director of Human Resources, discussed the possibility of Plaintiff applying for the position with Lanier Carson. (Id.). Plaintiff submitted his resumé in December 2016. (Id. at p. 108). On January 5, 2017, KMC extended a formal written offer to Plaintiff. (Doc. 28-7, p. 29). Per the terms of the offer, Plaintiff would be hired as the Director of Sales and Marketing. (Id.). Additionally, after an opportunity to acclimate to the equipment and culture of the business, KMC would promote Plaintiff to Vice President of Sales and Marketing and offer him a seat on the Board of Directors. (Id.). Plaintiff accepted the terms of employment on January 9, 2017, and began working for KMC on February 1, 2017. (Doc. 28

---

[1] Lanier Carson and Bennie Branch are co-Trustees. (Carson Dep., p. 93).

7, p. 30). Plaintiff's title changed from Director to Vice President some time shortly thereafter. (Laska Dep., p. 120; Carson Dep., p. 35).[2]

As the Vice President of Sales and Marketing, Plaintiff was accountable for a number of responsibilities. (Doc. 28-7, p. 31). Plaintiff coordinated and managed the activities of KMC's Territory Managers, Field Service Representatives, Distributers, and Advertising Manager. (Id.). He was responsible for determining staffing needs, including the hiring and firing of new personnel, with the approval of the company's President. (Id.). Additionally, Plaintiff's job entailed developing, editing, and publishing price lists and updates; disseminating marketing and sales information; accounting for lost sales; monitoring margins on all products; providing adequate and timely availability of finished goods; and other related tasks. (Id.).

Kelly Peele, who first began working for KMC as the Advertising Manager in 2011, resigned her position on June 30, 2017. (Peele Dep., p. 7-8; Laska Dep., p. 184). Prior to her resignation, Peele received an e-mail from a woman named Erica Thrift, who worked for Black Crow Media. (Peele Dep., p. 46-47). Thrift expressed an interest in meeting with Peele to discuss potential advertising

---

[2] The timing of the change in title is not clear. Plaintiff testified that he believed the change occurred around May 2017. (Laska Dep., p. 120). Carson testified that the change happed around March or April 2017. (Carson Dep., p. 35).

opportunities. (Id.). Peele scheduled a meeting with Thrift but resigned prior to the meeting taking place. (Id. p. 48-49; Laska Dep., p. 214).

About a week following Peele's resignation, Thrift contacted Plaintiff and asked if he would keep the appointment Thrift previously scheduled with Peele. (Laska Dep., p. 214). Thrift also inquired whether KMC intended to fill the Advertising Manager position. (Id.). Plaintiff set an appointment with Thrift for July 10, 2017 at 10:00 a.m. (Id.). Plaintiff met with Thrift and another male salesperson from Black Crow Media on July 10 to discuss agriculture-related advertising programs. (Id. at p. 215, 217). At the conclusion of the meeting, Thrift again asked about the Advertising Manager position. (Id. at p. 218). Plaintiff suggested that she e-mail her resumé. (Id.).

Thrift e-mailed Plaintiff at 10:33 a.m. on July 10, once more expressing an interest in the marketing position and asking whether she could send him her resumé. (Doc. 28-7, p. 63). Plaintiff responded to Thrift at 11:19 a.m., directing her to send her resumé to his wife, Debra Laksa, in Human Resources. (Id.). Thrift then e-mailed Debra Laska at 2:54 p.m. (Id. at p. 64-67). Mrs. Laska testified that after receiving Thrift's resumé, she provided a copy to Plaintiff. (D. Laska Dep., p. 158). She also printed a copy and placed it in Lanier Carson's box, along with numerous other resumés for various positions open throughout the company. (Id. at p. 158-160).

In later correspondence with the Department of Labor, Plaintiff described Thrift's physical appearance on the day of their meeting in great detail:

> I must admit that when I turned the corner I was a bit surprised as I was greeted by an attractive dark tanned tall brunette in very fit condition wearing a snakeskin print pair of pants and very revealing tight black sleeveless shirt exposing quite a bit of cleavage. I also noticed there was a script tattoo on her left shoulder and arm that read "love me for who I am" and some other tattoo on her right arm. My first thought was this did not appear to be appropriate business wear for a woman to be calling on advertising clients.

(Doc. 28-7, p. 82; Laska Dep., p. 216-217).

Plaintiff provided a similar description to Rhonda Pearman, Lanier Carson's Executive Administrative Assistant, immediately after his meeting with Thrift. (Laska Dep., p. 200; Pearman Dep., p. 30-31). On the way back to his office, Plaintiff stopped by Pearman's office and engaged in the following interchange:

> I asked her, I said, "Did you happen to see that lady and man that just came by here with me?" And she said no. I said, "Yeah, well," I said, "in my opinion she wasn't dressed correctly for a business engagement or business meeting."
>
> And she said, "Well, what do you mean by that?"
>
> And I explained what I just did, a tube top, you know, she was a very fit, attractive young lady, very bosomy, and she had on this small tube top with the tattoos. Rhonda immediately blurted out, "What a whore."

(Laska Dep., p. 220).

Plaintiff testified that he promptly chastised Pearman, saying, "Rhonda, you cannot call people whore. You don't know anything about this woman." (Id. at p. 220-221). He further stated, "Now, she might have been just a visitor when she came in, but now she's a job applicant." (Id.).[3] Pearman responded, "Well, I'm telling you right now the old man [Carson] ain't going to never let no bombshell like that work up in here." (Id.). Plaintiff then reiterated, "You can't discriminate against this woman, and you can't prejudge her. . . . She's got two kids, she's struggling to make ends meet. And, you know, just because she looks different from other people, you can't discriminate." (Id.). Pearman then told Plaintiff to "[g]et the F out of my office now." (Id.).

Throughout the afternoon of July 10, Plaintiff recounted his experience with Thrift and Pearman's reaction with employees in both the customer service department and the international sales department. (Id. at p. 225). While Plaintiff denies the allegation that when relaying his encounter with Thrift he referred to her as a "bombshell" and gestured with his hands to describe Thrift's physical features, he admits that he described her attire in detail and referred to her as being "fit, very attractive, [and having] dark skin." (Id. at p. 225-227). Plaintiff also

---

[3] Plaintiff admits that at the time of this conversation, Thrift had expressed interest in the open position but had not yet provided her resumé. (Laska Dep., p. 222-223).

admits that he repeated Pearman's reference to Thrift as a "whore." (Id. at p. 225).

Jimmy Tomberlin, KMC's CFO, testified that Plaintiff also relayed the incident to him. (Tomberlin Dep., p. 29). According to Tomberlin, Plaintiff came to his office and "described exactly what she was wearing. I remember he said she had on this fantastic leopard-skinned something, pants or outfit or something, tattoos in various places, very well-endowed, and was really – seemed excited to tell me about it." (Id.).

Plaintiff had a meeting with KMC's President, Bennie Branch, and Charles Sumner on July 10 as well. At the conclusion of the meeting, Plaintiff asked the two gentlemen if they had seen the "bombshell" in his office that morning. (Branch Aff., ¶ 6). Branch thought perhaps Plaintiff was referring to a large equipment order, but then Plaintiff began describing the "well endowed," "very, very, very well built" female visitor. (Id.). Branch testified that he was embarrassed by Plaintiff's comments. (Branch Dep., p. 62). Because the door to Branch's office was open, and because Plaintiff was speaking so loudly, Branch was also concerned that Rhonda Pearman, whose office was next door, may be embarrassed by Plaintiff's remarks as well. (Id.). Branch approached Pearman after the meeting and asked whether she heard Plaintiff's comments. (Id. at p.

60). Pearman responded "that [Plaintiff] had already been up and down the hall that morning saying the same things to other people." (Id. at p. 60-61).

Branch wrote a statement concerning the interaction on July 10, 2017. (Id. at p. 59-60). He felt as though the situation was serious enough that he "wanted to make sure that the details were . . . accurate." (Id. at p. 62). Branch also called Lanier Carson, who was not in the office at the time, to report the conversation with Plaintiff.[4] (Id. at p. 63; Carson Dep., p. 49). Carson said that he would handle it. (Id.). Carson testified that after receiving the call from Branch, he was concerned because "[o]ur company doesn't have a reputation of having people dress like [Plaintiff] had described to Mr. Branch." (Carson Dep., p. 51).[5] Carson then contacted Rhonda Pearman to ask whether she had heard anything about the woman from Black Crow Media. (Id.). She responded affirmatively. (Id.; Pearman Dep., p. 36-37).

---

[4] July 10, 2017, fell on a Monday, and Carson only worked in the office Wednesday through Friday. (Laska Dep., p. 220). At the time these particular events transpired, Carson was on St. Simons Island. (Carson Dep., p. 50).

[5] KMC's Management Guide, with which Plaintiff would have been familiar as a member of management, sets out conservative guidelines for employee dress: "It is important for KMC employees to present a professional image to customers and visitors. . . . During business hours, female employees shall not be permitted to wear mini-skirts, leggings, tank tops, blue jeans, shorts or dresses above the knee. Skirts below the knee with modest splits will be acceptable. Men will not be permitted to wear blue jeans, tee shirts, tank tops, or shorts. Men are required to wear socks and shirttails must be tucked inside pants." (Doc. 28-20, p. 16).

The next day, July 11, 2017, Carson directed Pearman to send an e-mail to Plaintiff, Jimmy Tomberlin, and Bennie Branch, with the subject line "Visitor from Black Crow Media." (Carson Dep., p. 52; Pearman Dep., p. 37-38; Doc. 28-7, p. 68). He then dictated the following message, which was transmitted to the intended recipients at 1:42 p.m.:[6]

> I have received multiple calls about the "bombshell" that came into the office yesterday (from Black Crow Media). **Under no circumstances** do we need to make a commitment to someone like this for advertising or whatever her reason for being at KMC! I will schedule a meeting tomorrow to discuss this matter.

(Doc. 28-7, p. 68) (emphasis in original). Upon receiving the e-mail, Plaintiff confronted Pearman, demanding to know who made the multiple calls to Carson. (Laska Dep., p. 234). Pearman denied contacting Carson and again told Plaintiff to "[g]et the F out." (Id. at p. 241). Plaintiff also approached Bennie Branch about the e-mail on the afternoon of July 11. Branch wrote a contemporaneous statement documenting the conversation:

> He asked if I had seen her. I said I had not. He said no one other than he had seen her, so the emails must have been stirred up by the, quote, large woman, end quote, up front. He said, quote, that is discrimination, period, end quote. He states he, quote, did not agree with that, period, end quote.

---

[6] It was standard practice for Carson to dictate e-mails for Pearman to send on his behalf from her company e-mail address. (Pearman Dep., p. 28). He reviewed the content of the e-mails prior to them being sent. (Id.).

(Branch Dep., p. 65). Branch believed Plaintiff to be referring to Pearman as the "large woman up front." (Id. at p. 66). Branch testified that was the first time he heard Plaintiff use the term "discrimination." (Id.). Yet Plaintiff "did not elaborate on who was being discriminated against and why." (Id. at p. 69). From Branch's perspective, "if there was any discrimination going on, it was [Plaintiff's] actions toward this woman, not that – not that there was any discrimination on Ms. Pearman's part." (Id. at p. 70).

Following the Board meeting on the morning of July 12, 2017, Carson requested that Plaintiff, Branch, and Tomberlin stay after the meeting. (Laska Dep., p. 244; Carson Dep., p. 53; Branch Dep., p. 73). Carson then asked Plaintiff about his involvement with Erica Thrift:

> Now, [Carson] asked me directly, "Did you set up the appointment with this woman originally to, you know, do business?"
>
> And I said, "No, sir."
>
> And he paused, and he said, "Did you contract to do any business with her?"
>
> And I said, "No, sir."
>
> And he says, "Well," he says, "I'm going to tell you right now, we don't need white trash like that running around this building up here."
>
> And I said, "Well, okay."
>
> And I did not want to get in a confrontation with him, so I had nothing to say, literally nothing to say at that point.

(Laksa Dep., p. 244-245). According to Plaintiff the last comment Carson made was something along the lines of "Well, she's like a whore of Babylon, is what I understand." (<u>Id.</u> at p. 245). Nothing more was said. (<u>Id.</u>).

Later that same afternoon, Plaintiff met with Carson individually. (<u>Id.</u>; Carson Dep., p. 54-55). Carson stated that Pearman mentioned that Plaintiff was still mad at Pearman about the situation. (<u>Id.</u>). Plaintiff denied being mad and remarked, "I'm simply trying to save the company from being put in a liable situation where we could be sued for discrimination." (<u>Id.</u> at p. 246). To which Carson retorted, "Who the hell made you an attorney?" (<u>Id.</u>). Plaintiff replied, "I don't have my law degree, Mr. Carson, but the fact is that email was discriminatory since that woman is a job applicant." (<u>Id.</u>). Carson then said, "I'm done with you. Get out." (<u>Id.</u>).

Plaintiff testified that after this conversation with Carson, neither he nor his wife ever had access to Carson or Pearman again. (<u>Id.</u>). They were locked out of meetings and denied appointments. (<u>Id.</u> at p. 247-248). Plaintiff stated, "I was pretty much blackballed at that point. I knew what was going on." (<u>Id.</u> at p. 248). Plaintiff and his wife left on July 19, 2017, to attend a trade show as representatives of KMC in San Destin, Florida. (<u>Id.</u> at p. 145). On July 21, 2017, Plaintiff received a series of e-mails documenting alleged errors he had made.

(Id. at p. 301-308). Plaintiff believed that the e-mails were a part of "the witch-hunt to find something wrong." (Id. at p. 306).

Both Plaintiff and his wife were suspended with pay upon returning from their business trip on July 24, 2017. (Id. at p. 312-313). They were told that once they were removed from the Board of Directors that they would be terminated. (Id. at p. 313). They were not notified of a specific reason for their termination. (Id.). Carson said only that they had violated company policy. (Id.).

Plaintiff filed his first Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 3, 2017. (Doc. 28-7, p. 113-114). Plaintiff and his wife were terminated effective August 7, 2017. (Laska Dep., p. 319).[7] Plaintiff filed a second Charge of Discrimination on September 15, 2017. (Doc. 28-7, p. 115). The EEOC issued Plaintiff a Notice of Suit Rights on November 21, 2017, and this lawsuit followed on December 21, 2017. (Doc. 1; Doc. 1-2, p. 2).

---

[7] KMC provided a separation notice to the Department of Labor outlining numerous reasons for his termination, including violating the policy prohibiting the use of profanity; engaging in unprofessional and harassing conduct toward other employees; making disrespectful comments to and about co-workers; making inappropriate comments of a sexual nature about a female visitor in the workplace; engaging in conduct that could harm dealer relationships; offering inconsistent sale and pricing terms to different dealers. (Doc. 28-7, p. 80).

## II.    SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and to present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. "If the record presents factual issues, the court must not decide

them; it must deny the motion and proceed to trial." <u>Herzog v. Castle Rock Entm't</u>, 193 F.3d 1241, 1246 (11th Cir. 1999). But, when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

III. **ANALYSIS**

Defendant argues that summary judgment is proper because Plaintiff cannot establish a claim for Title VII retaliation. Defendant contends that any belief by Plaintiff that he engaged in a statutorily protected activity by opposing purportedly discriminatory conduct by Defendant was neither subjectively nor objectively reasonable. Alternatively, Defendant argues that even if Plaintiff did oppose an unlawful employment practice, the "manager rule" prohibits him from recovering under Title VII.

A. **Title VII Retaliation**

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The anti-retaliation provision of Title VII sets forth two clauses, the "opposition clause" and the

"participation clause." <u>Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.</u>, 555 U.S. 271, 274 (2009). This case entails the application of only the opposition clause.[8]

In order to establish a prima facie case of retaliation, the plaintiff must demonstrate that he (1) participated in statutorily protected activity; (2) suffered a materially adverse employment action; and (3) that there is a causal connection between the two. <u>Evans v. Books-A-Million</u>, 762 F.3d 1288, 1298 (11th Cir. 2014). To set forth a retaliation claim under the opposition clause, the plaintiff must also show

> that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this

---

[8] In his Complaint, Plaintiff pleaded that he filed his charge of retaliation with the EEOC on August 3, 2017; that he notified Defendant's attorney of the charge by e-mail that same day; and that he was terminated on August 7, 2017 – all facts that might otherwise indicate that Plaintiff was pursuing a claim for retaliation under the participation clause. (Doc. 1, ¶¶ 4, 25). However, Plaintiff has not offered any evidence that he was discriminated against as a result of his filing an EEOC charge, nor has he responded to Defendant's argument that there is no causal connection between the filing of the charge and his termination. Plaintiff accordingly has abandoned any claim that he was entitled to protection under the participation clause. <u>See</u> <u>Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta</u>, 219 F.3d 1301, 1326 (11th Cir. 2000) ("[F]ailure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.").

regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

Little v. United Tech., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997) (emphasis in original). The plaintiff "need not prove that the conduct he opposed was actually unlawful, . . . but the reasonableness of his belief that [the employer] engaged in an unlawful employment practice must be measured against existing substantive law." Howard v. Walgreen Co., 605 F.3d 1239, 1244 (11th Cir. 2010) (internal citation omitted) (quoting Clover v. Total Sys. Servs, Inc., 176 F.3d 1346, 1351 (11th Cir. 1999)).

Plaintiff contends that he affirmatively opposed Defendant's allegedly discriminatory conduct toward Erica Thrift on three separate occasions: (1) on July 10, 2017, when he chastised Rhonda Pearman for referring to Thrift as a "whore" and a "bombshell" (Laska Dep., p. 220-221); (2) on July 11, 2017, when after receiving the "bombshell" e-mail he told Bennie Branch "that large woman up front" – presumably referring to Pearman – was stirring up trouble that was "discriminatory" (Branch Dep., p. 65-66, 69-70); and (3) when he expressed to Lanier Carson that he was "trying to save the company from being put in a liable situation" (Laska Dep., p. 246). (Doc. 34, p. 14). Plaintiff may have subjectively believed that Pearman and Carson's comments responding to Plaintiff's physical

description of Thrift amounted to unlawful gender discrimination. But his belief was not objectively reasonable in light of the facts and evidence in the record.

Any comment made by Pearman that Thrift was a "whore" or a "bombshell" in reaction to Plaintiff's vivid description of Thrift's attire, while certainly unprofessional, was not discriminatory as contemplated by Title VII. Title VII bars an employer from discriminating against an employee based on an immutable characteristic, such as race or gender, and also prohibits engaging in differing hiring schemes for men and women "*if* the distinction is based on some fundamental right." Willingham v. Macon Tel. Pulb'g Co., 507 F.2d 1084, 1091 (5th Cir. 1975) (en banc) (emphasis in original). "But a hiring policy that distinguishes on some other ground, such as grooming codes or length of hair, is related more closely to the employer's choice of how to run his business than to equality of opportunity." Id.; see also Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Sol., 852 F.3d 1018, 1020 (11th Cir. 2016) (affirming dismissal of case filed by a black job applicant whose job offer was rescinded pursuant to the employer's race-neutral grooming policy when she refused to cut off her dreadlocks). Title VII instead "focuses its laser of prohibition" on discriminatory acts based on characteristics "that are either beyond the victim's power to alter, or that impose a burden on an employee on one of the prohibited bases." Id.

Defendant here enforced a conservative dress code that Thrift did not meet on the day of her visit to KMC. (Doc. 28-20). Regardless of that code, however, Pearman, as an Executive Administrative Assistant, was not a decision-maker for Defendant, and her personal comments to Plaintiff cannot be construed as discriminatory. More importantly, though, is the fact that at the time of this alleged conversation, Erica Thrift was neither a job applicant nor an employee of Defendant and, therefore, fell outside the scope of any protection afforded by Title VII. Regardless of what Plaintiff might have said to Pearman about Thrift's status as a potential job applicant, Plaintiff admits that when this interaction occurred, he had not yet received Thrift's resumé. (Laska Dep., p. 222-223).[9] There is no evidence that Pearman engaged in an unlawful employment action in relation to Thrift. Consequently, Plaintiff's subsequent comments to Bennie Branch about Pearman causing trouble by allegedly contacting Carson likewise cannot objectively be construed as protected conduct.

---

[9] How the application process at KMC works is not clear. According to Lanier Carson, the formal application process requires completion of an application and a background check. (Carson Dep., p. 56). Plaintiff's wife, who worked in Human Resources prior to her termination, testified that "[u]sually if we were interested in that person, then we would have them fill out an application." (D. Laska Dep., p. 164). Plaintiff said that he would filter out resumés for any unqualified candidates and then pass the resumés along to Carson for him to decide who to interview. (Laska Dep., p. 249-250). Plaintiff mentioned nothing about a formal application process. Nevertheless, at the time of his conversation with Pearman, Thrift had done nothing more than express a verbal interest to Plaintiff in the open Advertising Manager position.

Plaintiff's conversations with Carson on July 12 also cannot objectively be considered statutorily protected conduct. During the meeting between Carson, Branch, Tomberlin, and Plaintiff following the meeting of the Board of Directors, Carson posed a series of questions to Plaintiff that clearly pertained to whether or not KMC would conduct business with Thrift as a representative of Black Crow Media. (Id. at p. 244-245). Again, any comments Carson might have made regarding Thrift as "white trash" or the "whore of Babylon" while crass were not discriminatory in the context in which they were spoken. (Id.). No one ever discussed Thrift's potential future potential with KMC. Plaintiff also did not accuse Carson or any decision-maker of discrimination during this meeting.

When Plaintiff met with Carson again on the afternoon of July 12, he appeared to be complaining more about Pearman than anything else. (Id. at 207-208, 245-246). To the extent Plaintiff was addressing any perceived discrimination based on either Carson's e-mail in which he referenced the "bombshell" that had been in the office and not making a commitment to engage in business with her or on Carson's ineloquent remarks at the conclusion of their morning meeting, any belief that these remarks were unlawful is not objectively reasonable. It is plain that any commentary was made toward Thrift as a representative of Black Crow Media and not as a potential job applicant.

In the absence of evidence that Plaintiff opposed an unlawful practice, Plaintiff fails to establish a prima facie case of retaliation. Defendant accordingly is entitled to summary judgment as a matter of law.

### B.    "Manager Rule"

Even if the evidence did support a finding that Plaintiff both subjectively and objectively believed that Defendant was discriminating against Thrift, Defendant still would be entitled to summary judgment on Plaintiff's claim for retaliation based on the application of the "manager rule." "In essence, the 'manager rule' holds that a management employee that, in the course of her normal job performance, disagrees with or opposes the actions of an employer does not engage in 'protected activity.'" Brush v. Sears Holdings Corp., 466 F. App'x 781, 787 (11th Cir. 2012)[10] (citing McKenzie v. Renberg's Inc., 94 F.3d 1478 (10th Cir. 1996); Hagan v. Echostar Satellite, L.L.C., 529 F.3d 617 (5th Cir.

---

[10] The Court recognizes that Brush is an unpublished opinion, making it persuasive rather than binding authority from the Eleventh Circuit Court of Appeals. See 11th Cir. R. 36-2. The Court is also aware that other circuits have declined to apply the "manager rule" in the context of Title VII. See De Masters v. Carilion Clinic, 796 F.3d 409, 422 (4th Cir. 2015). Nevertheless, the Court finds Brush persuasive and concludes that application of the "manager rule" is appropriate in Title VII cases where, as here, the employee is merely reporting possible discrimination and not actively supporting other employees in asserting their Title VII rights. See Littlejohn v. City of New York, 795 F.3d 297, 318 (2d Cir. 2015) ("To the extent an employee is required as part of her job duties to report or investigate other employees' complaints of discrimination, such reporting or investigating by itself is not a protected activity under [the] opposition clause, because merely to convey others' complaints of discrimination is not to oppose practices made unlawful by Title VII.").

2008)). In order "to qualify as 'protected activity' an employee must cross the line from being an employee 'performing her job . . . to an employee lodging a personal complaint.'" Id.

Plaintiff's conduct falls squarely under the "manager rule." During his conversation with Carson on July 12, 2017, Plaintiff testified that he told Carson, "I'm simply trying to save the company from being put in a liable situation where we could be sued for discrimination." (Laska Dep., p. 246). He then reiterated in his deposition that "[i]t was my intention to watch out for the company." (Id. at p. 247). He also explained his belief that if the "bombshell" e-mail "had gotten on the outside of the company [it] could certainly put us in jeopardy." (Id.).

For the first time in his response brief, Plaintiff claims that he was "personally advocating on behalf of the employee so that she would not be subjected to discrimination." (Doc. 34, p. 16). In support of this assertion, Plaintiff cites to a portion of his deposition testimony in which he testified that he was sympathetic to Erica Thrift's personal circumstances. (Laska Dep., p. 218-219). Plaintiff may very well have felt sympathy toward Thrift as a struggling single mother; but those feelings do not negate the fact that there is no evidence in the record that he ever personally advocated on her behalf. Rather, he emphatically stated on more than one occasion that his objective was to guard KMC against any potential liability.

Plaintiff also argues that the "manager rule" does not apply to him because he was not a human resources employee, nor was he tasked with conducting any investigation into alleged discrimination. The "manager rule" does frequently arise in the context of employees working within human resources. <u>See McMullen v. Tuskeegee Univ.</u>, 184 F. Supp. 3d 1316 (M.D. Ala. 2016). But the rule as set forth in <u>Brush</u> refers generally to a "management employee," which encompasses persons in management positions outside of human resources. 466 F. App'x at 787; <u>see</u> <u>also</u> <u>Hartzog v. Resolute Fp US, Inc.</u>, 1:15-Cv-726-VEH, 2016 WL 6277428 (N.D. Ala. Oct. 27, 2016) (applying the "manager rule" to a Team Leader responsible for a shift operations team).

It is undisputed that Plaintiff was employed by KMC in a management capacity. Without evidence that Plaintiff took an affirmative step past merely bringing to his employer's attention the potential for liability to affirmatively lodging a complaint on behalf of another individual protected under Title VII, Plaintiff's retaliation claim is foreclosed under the "manager rule." Summary judgment for Defendant is therefore proper.

## IV.     Conclusion

For the reasons discussed herein, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 28). This case is hereby dismissed with prejudice.

**SO ORDERED**, this the 26th day of September, 2019.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

aks